UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KURT HAMMOND,

    Plaintiff,

v.                                                                       Case No. 17-13051

COUTY OF OAKLAND, et al.,              HON. AVERN COHN

    Defendants.
_____/


## MEMORANDUM AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 45)

I. Introduction

This is a case under 42 U.S.C. § 1983. Plaintiff Kurt Hammond (Hammond) is suing the following defendants: Oakland County, Deputy Sheriff Christopher Cadotte (Cadotte), Deputy Sheriff James Salyers (Salyers), and Deputy Sheriff D. Welch (Welch).[1] The incident involves the use of force by deputies and a canine, Odin. Cadotte is Odin's handler. The complaint asserts the following claims:

    I.      Violation of § 1983 - unreasonable search and seizure, unlawful use of excessive force

    II.     Violation of § 1983 – municipal liability

---

[1] Hammond also sued Deputy Crystal Lemke (Lemke), Deputy R. Garcia, Detective Michael Miller, and Detective Eric Tremonti. He later dismissed his claims against them. See ECF No. 42.

III. Willful and Wanton Misconduct, Deliberate Indifference/Gross Negligence

Before the Court is defendants' motion for summary judgment.[2] For the reasons which follow, the motion will be denied. Hammond has more than carried his summary judgment opposition burden, demonstrating he has a right to present his case against all defendants to a jury.

II. Background

The facts as gleaned from the parties' papers follow.

A. Events Before Deputies Arrived - Undisputed.[3]

A few days prior to the incident, Hammond met a woman at a local gas station. On the date of the incident, the woman called him and asked to be picked up. Hammond, along with a male friend, picked up the woman from outside of a house and went to a local bar. All of them, except Hammond, began drinking. Eventually, Hammond, the woman, Hammond' male friend, and another woman went to Hammond's house. When they arrived at Hammond's house, the woman got "loud," stated she was "off her meds" and asked Hammond to have sex with her. Hammond's male friend and the other woman left. The woman began eating Hammond's food and said she wanted to move in with him. Hammond told her to leave. The woman then became upset, started throwing things around the house, and told Hammond that she

---

[2] Hammond also filed a motion in limine regarding a prior criminal conviction. See ECF No. 43. This motion will be considered as the case approaches trial.

[3] Most of the following facts are taken from Hammond's statement to an unnamed police officer while he was at the hospital being treated for injuries related to the incident. Hammond asserted his Fifth Amendment rights at deposition because, as explained below, he faces criminal charges from this incident.

was going to call the police and claim he raped her. The woman then picked up a coffee mug and struck Hammond in the head with the mug. Next, the woman pulled out a knife and stabbed Hammond in the chest. The woman then left the house, telling Hammond she was going to call her biker friends to come back to the house. Hammond then closed and locked his doors. He believes he then fainted. Once he came to, he noticed his chest was bleeding and went to his bathroom to tend to his stab wound.

Meanwhile, the woman called 911 and apparently reported she had been raped. Presumably, the call was to a 911 dispatch operator who put out a dispatch. It is not clear who took the call or exactly what information was relayed. Piecing together deposition testimony from the deputies, it appears that Lemke and Salyers were on road patrol and responded to the dispatch. Welch, a deputy trainee, was with Lemke and Salyers. The deputies began searching for the woman. It also appears that Lemke and Salyers were informed that the woman reported she had stabbed her attacker with a knife. While the deposition testimony references reports and narratives, the record does not contain any reports, narratives or investigative notes from the deputies who responded. Indeed, it is not clear if the deputies were going to Hammond's house to investigate the woman's claim or to arrest him.

What is known is that Salyers and Lemke located the woman at a house down the street from Hammond's. The woman led them to Hammond's house and turned over the knife she used to stab Hammond. Cadotte arrived shortly after with Odin. In total, five deputies and a police dog[4] arrived at Hammond's house. The deputies were

---

[4] According to defendants' counsel, Odin is also considered a police officer. Therefore, there were six deputies involved.

Lemke (who has since been dismissed), Salyers, Cadotte, Welch, and another deputy (presumably one of the other dismissed deputies).

Hammond's house is approximately 500 square feet and is comprised of a front room, kitchen, bathroom, and a small bedroom.

### B. Events After Deputies Arrived - Disputed

The parties have differing accounts of what occurred once the deputies arrived at Hammond's house.

#### 1. Hammond's Version

Hammond says he heard banging on his back door and thought it was the woman's biker friends coming to hurt him. Hammond yelled for them to go away or he would call the police. He then heard "we are the police!" Hammond then told them to come to the front door. Hammond opened the door for the deputies, who entered the house along with a canine. He then retreated into the bedroom to tend to his stab wound. When Hammond stepped out from the bedroom, he says he was tackled by the deputies and bitten by the canine on his back.

Hammond also says that he was holding his chest to stop the bleeding while the deputies tackled him. Hammond asked the officers to stop and help him. Hammond did not know why the deputies were on top of him. He says that Odin continued to bite his right leg while the deputies stood and watched. He denies actively resisting prior to being bitten on the leg. Hammond says he could hear his bones snapping in his head while the canine continued to chew on his leg. At one point he heard a deputy give a command to Odin, but Odin did not comply. Hammond also denies kicking his legs

toward Odin's face because he says his legs were pinned at the time.  Hammond says that he never resisted.  He also said the incident seemed to last forever.

2.  Defendants' Version

When the deputies arrived at Hammond's house, Lemke went to the front door while Salyers and Welch went to the back door. The deputies knocked on both doors, announced their presence, and requested Hammond come outside and speak with them. When they received no response, the deputies contacted a sergeant and were given permission to try and kick the door in because there was a possible stabbing victim inside. They were unable to kick in either door.  At some point, the deputies heard a male voice from inside the house indicating he needed 911. Welch responded that they were 911. Salyers then made visual contact with Hammond, observing him through a window pacing back and forth between the living room and a doorway to an unknown location. While he was pacing, Hammond yelled that he could not come to the door because he was in the bathroom.

Cadotte says could not see what was going on inside the house and Hammond was not complying with the deputies' directions; he did not know if Hammond was arming himself, trying to destroy evidence, or bleeding out.  Cadotte further says when Hammond opened the door, he ordered Hammond to come out onto the front porch with his hands up.  Hammond failed to comply. Instead, Hammond retreated into a bedroom, out of sight. Cadotte gave a verbal command to come out or he would send his canine into the house, which he says he repeated three to five times. When Hammond failed to respond or comply, Cadotte sent Odin into the house without a leash. Odin went to the doorway that led to the bedroom, barked, and returned to Cadotte, which indicated that

5

Hammond was still in the room. Cadotte further says that he considered Hammond's retreat from the front door as an attempt to flee.

Cadotte and Welch both testified that because they could not see Hammond's hands when he stepped out of the bedroom, Cadotte pulled Hammond into the living room and took him to the ground. Welch said he assisted by grabbing Hammond while he was on the ground. During that time, Odin bit Hammond on his back. Cadotte and Welch ordered Hammond to show his hands and get on the floor. Cadotte fell on top of Hammond's right shoulder and chest, while Salyers and Welch attempted to handcuff him. During the struggle, Odin started to bite Hammond's right foot. Odin also bit Cadotte during the struggle. According to Cadotte, upon seeing Odin on the bite, Cadotte got off of Hammond, stood back, and had Odin release the bite and heel. However, Salyers testified that he grabbed Hammond's right side so Cadotte could release and remove Odin. Salyers and Welch continued to wrestle with Hammond until they placed him in handcuffs.

After Hammond was handcuffed he began flailing his legs and kicked toward Odin's face. Odin then re-engaged Hammond's leg, which the deputies say was appropriate because Odin was protecting himself from the kick. Cadotte then grabbed Odin's collar, pulled him away, put him on a leash, and walked Odin out the door. The entire incident lasted about 20 seconds.

### C. Subsequent Events – Undisputed

Hammond suffered injuries from the incident, including several broken bones in his foot which required medical treatment.

6

Hammond was arrested and charged in Oakland County Circuit Court with unlawful imprisonment and CSC Second Degree. He was unable to make bond. The woman twice failed to appear in court. Undaunted, prosecutors eventually located her out of state where she was incarcerated, ironically, for stabbing another individual. The prosecution has moved forward. Hammond, having been unsuccessful in having his bond reduced, remains incarcerated while awaiting trial.

### III. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Rule 56 provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support a fact.

Fed. R. Civ. P. 56(c)(1).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). In so doing, the

7

Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995).

IV. § 1983 Claims

A. In General

Under § 1983, an individual may bring a private right of action against anyone who, under color of state law, deprives a person of rights, privileges, or immunities secured by the Constitution or conferred by federal statutes. Blessing v. Freestone, 520 U.S. 329, 340 (1997); Maine v. Thiboutot, 448 U.S. 1, 4 (1980).

To state a claim under 42 U.S.C. § 1983, plaintiff must show that defendants violated a federal constitutional or statutory right while acting under color of state law. Sigley v. City of Parma Heights, 437 F.3d 527, 533 (6th Cir. 2006). There is no dispute as to the second element. Cadotte, Salyers, and Welch were uniformed deputies responding to a call while on duty. They plainly were acting under color of state law. The Court must determine only whether the evidence in the record would allow a reasonable jury to conclude that defendants violated Hammond's Fourth Amendment rights. If the Court finds a constitutional violation, the question then becomes whether the right alleged to have been violated was clearly established at the time of the violation. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Pearson v. Callahan, 555 U.S. 223, 232 (2009). In making these determinations on summary judgment, the Court must look at the facts in the light most favorable to the non-moving party.

B. Individual Defendants - Qualified Immunity

1. Legal Standard

Cadotte, Salyers, and Welch contend that they are entitled to summary judgment on plaintiff's § 1983 claim on the basis of qualified immunity. Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation[.]" Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). "Through the use of qualified immunity, the law shields 'government officials performing discretionary functions ... from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.' " Solomon v. Auburn Hills Police Dep't, 389 F.3d 167, 172 (6th Cir. 2004) (quoting Anderson v. Creighton, 483 U.S. 635, 638 (1987)). Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity. Ciminillo v. Streicher, 434 F.3d 461, 466 (6th Cir. 2006).

In determining whether a defendant is entitled to qualified immunity, the Court makes two inquiries: (1) "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right[,]" and (2) was the right "clearly established" to the extent that a reasonable person in the officer's position would know that the conduct complained of was unlawful. Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009). Although Saucier mandated that these questions be addressed in order, that requirement has since been relaxed. See Pearson, 555 U.S. at 236 ("On reconsidering the procedure required in Saucier, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.").

With regard to the second step,

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in

question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Anderson, 483 U.S. at 640 (citations omitted). If genuine issues of material fact exist as to whether the officer committed acts that would violate a clearly established right, then summary judgment is improper. Poe v. Haydon, 853 F.2d 418, 425–26 (6th Cir. 1988).

2. Application

Cadotte, Salyers and Welch are not entitled to qualified immunity. As an initial matter, the right to be free from excessive force is clearly established. In Graham v. Connor, the United States Supreme Court established that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." 490 U.S. 386, 395 (1989) (emphasis in original). The Supreme Court has explained that the reasonableness of the use of a particular level of force is evaluated by balancing " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.' " Tennessee v. Garner 471 U.S. 1, 8 (1985) (quoting United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)) (further citations omitted). The ultimate question is "whether the totality of the circumstances justified a particular sort of search or seizure." Id. at 8–9, 105 S.Ct. 1694.

As to the use of a canine to assist in arresting suspects, the Sixth Circuit has said:

> The court has held that officers cannot use "an inadequately trained canine, without warning, to apprehend two suspects who were not fleeing." On the other end of the spectrum, the court has also held that it

10

was reasonable for officers to use a properly trained dog to apprehend a
suspect who was hiding in a darkened, unfamiliar area, and who was
warned that the dog would be released unless he surrendered.

Ashford v. Raby, No. 18-10813, 2019 WL 2231188, at *3 (E.D. Mich. May 23, 2019) (citations omitted).

Additionally, in Campbell v. City of Springboro, Ohio, 700 F.3d 779 (6th Cir. 2012) the Sixth Circuit affirmed a denial of summary judgment where an officer used a canine to apprehend two suspects who were not fleeing. In Campbell, the court reasoned that the officer's use of the police dog was unreasonable because he allowed the canine "to attack two suspects who were not actively fleeing and who, because of proximity, showed no ability to evade police custody." Id. at 789.

This is a classic situation of two competing versions as to the nature, extent, and reason for the use of force. As to Cadotte, a reasonable jury could conclude that the use of Odin and the force Odin and Cadotte applied to Hammond, was objectively unreasonable. This is particularly so where there is a factual dispute as to whether Hammond was resisting and trying to flee. Reasonable minds could also find that Cadotte's use of Odin was unreasonable and excessive in light of Hammond's version of the facts. Assuming Hammond was not trying to flee, and the fact that the officers had already tackled Hammond to the ground when he was bit by Odin, a jury could find Cadotte's actions unreasonable. See Campbell, 700 F.3d at 787 (stating that the plaintiff who made eye contact with the officer while lying on the ground before being bitten by a canine "made out a colorable argument for excessive force based upon [the officer's] improper handling [of the dog].").

As to Welch and Salyers, reasonable minds could also conclude that they used excessive force in restraining Hammond and in failing to intervene to prevent Odin from continuing to bite Hammond. "[A]n officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and means to prevent the harm from occurring." Turner v. Scott, 119 F.3d 425, 429 (6th Cir. 1997) (internal citation omitted). See also Batson v. Genesee County, No. 19-1070 (6th Cir. Oct. 11, 2019) (unpublished). Here, a jury could conclude that Hammond was not resisting or hiding and Welch and Salyers either assisted in using excessive force of their own and/or failed to take steps to prevent Odin from further attacking Hammond.

Hammond also relies on its "Use of force Expert" Dr. Aaron Westrick who opines that Cadotte should not have used Odin to "bite a non-threatening, non-fleeing Hammond." See Hammond's Exhibit H – Westrick's report. Westrick also noted that this was Odin's first deployment of a "bite" in a non-training situation. Additionally, the record contains evidence from which a jury could conclude that Odin was not properly trained. Hammond points to another expert, Hector Hernandez, a "police dog training expert" who says that Odin was not properly trained and cites several examples from Cadotte's deposition testimony as to how he handles Odin, including Cadotte's testimony that Odin continues to bite after he is ordered to stop, that Cadotte did not know at first that Odin had bit Hammond, and the fact that Odin bit Cadotte during the incident.

12

Overall, based on the record, there is a material question of fact as to whether Hammond posed a threat and whether the use of force, including the use of Odin, was reasonable and necessary under the circumstances. Accordingly, Cadotte, Salyers, and Welch are not entitled to qualified immunity.

### B. Oakland County - Municipal Liability

#### 1. Legal Standard

A municipality can be held liable under § 1983 where it is shown that a municipal custom or policy is the "driving force" behind the constitutional violation. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). A plaintiff asserting a § 1983 claim on that basis must identify the policy, connect the policy to the municipality, and show that the specific injury at issue was caused by the execution of that policy. Graham v. County of Washtenaw, 358 F.3d 377, 383 (6th Cir. 2004).

To make out a showing of an illegal policy or custom, a plaintiff must demonstrate one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013). A county "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." Monell, 436 U.S. at 694.

#### 2. Application

Hammond asserts that Oakland County failed to have an appropriate canine policy in place, and instead left it up to the officers to determine if, when, and how a police dog was used and whether or not a leash was used. In response, Oakland

13

County relies on two policies – its use of force policy and canine policy – and argues both are adequate. Oakland County admits that that the use of force policy does not explicitly reference the use of a canine but contends that the use of a canine as a means of force falls into the less than lethal or physical control category. The canine policy provides that dogs can be used to search open areas, buildings for lost persons or criminal suspects, and any other function in which they are trained. However, there is nothing in the written policy about when a canine should be on a leash.

In response, Hammond cites the following excerpt from Westrick's report:

> The Oakland County Sheriff's Office does not have a use-of-force policy regarding the use of Canine units. The Oakland County Sheriffs Office's Use-of-Force Policy does not directly address the use-of- police K-9 units. The Oakland County Sherrifs Office canine policy does not directly address the use of force by a canine unit. The Canine unit (Odin) is trained to search and bite. This Canine technique is considered a use-of-force measure. Law enforcement use of canines in force incidents must control the handlers and animal's use-of-force through an understanding of the animal's threats and capabilities, and through proper policies, procedures and training. The Oakland County Sheriff's Office did not have any policy, procedure or practice in place to regulate the use-of-force with Canine Units, and the training was inadequate. Neither the Oakland County Use- of-Force Policy nor the Oakland County Canine Policy along with Oakland County Sheriff Department's supervision practices and canine handler training are sufficient to regulate use-of-force canine deployment.

Moreover, Ernest Burwell, another of Hammond's experts, stated in his report as follows:

> Cadotte (and his dog Odin), used excessive and unnecessary force in the course of the arrest of Mr. Hammond that was not warranted under the circumstances. Many factors led to this occurrence including the failure of Oakland County to have appropriate policies and procedures in place, the failure of the County to properly train the handler (in this case, Cadotte) in the appropriate and proper method(s) to utilize a police dog and the precise circumstances that such use would be permitted. Canine policy 273 was completely inadequate to give appropriate and legal guidance to deputy dog handlers.
> The policies, procedures and practices that the Oakland County Sheriff's Department has in place for the canine services detail does not follow the best

14

practices for canine deployments, supervision, or training. The policies and procedures are completely deficient and provide no guidance to canine handlers. Deputy Cadotte testified that he is the one that solely makes the determination as to whether Odin is acting appropriately or not. Pg.42, Cadotte deposition

There is no language in policy number 273, on the "search and bite" process, as it was called by Deputy Cadotte, that is used by the canine handlers in Oakland County, (including during the arrest of Mr. Hammond). Cadotte deposition p. 168.

Sgt. David Roddy testified as the Oakland County's representative regarding policies and procedures of the County as it relates to police canines. Sgt. Roddy admitted the following with regard to the policies and procedures of the Oakland County Sheriff Department, all of which demonstrate a failure to provide proper policies and procedures for deputy dog handlers to follow. He agreed that generally policies and procedures are there to "assist and give guidance [to deputies] in how they perform their activities while acting as deputies". [Exhibit J, Sgt. Roddy's Deposition] p. 15.

His testimony showed the following regarding the K-9 policy number 273:

A. The County has no policies or procedures regarding the use of canines leashed or unleashed. p.22, 27, 41, 45, 59, 6015.
B. The use of a leash is entirely up to the deputy's discretion. P. 22
C. There is nothing in the canine policy that discusses the "use of force" by a canine. p. 28, 30, 37, 38-39, 40-41, 42, 43
D. The County's "Use of Force" policy contains nothing that references the use of canines or the canine policy. P. 28, 30, 67
E. There are no policies that provide guidance regarding the use of K-9's in the course of an arrest other than the general statement that they can be used for handler protection. p. 22
F. There is no guidance on how to train the canines in the policies and procedures. p. 26, 27, 30
G. Regardless of the number of deputies deployed in a certain circumstance, a canine can still be deployed. p. 36
H. There is nothing in the training section of the canine policy that references use of a canine in the course of an arrest. p. 40-41
I. The bite of a canine is regarded as a reward. p. 46
J. There is nothing in the policies and procedures on the appropriate training of a canine or its handlers. p. 48-49, 72, 76


See Ernest Burwell's Report April 30, 2019 (Hammond's Exhibit J)

From the above, Hammond has produced evidence from which a jury could

conclude that Oakland County had deficient policies and procedures in effect to handle

a situation involving the use of a canine in the course of an arrest as well as inadequate policies in the use and training of canines, generally. As a result, Oakland County is not entitled to summary judgment.

C. State Law Claim

Under Count III, Hammond pleads as a separate cause of action, "willful and wanton misconduct, deliberate indifference, and gross negligence." Gross negligence is not a standalone cause of action under Michigan law. Under Michigan's Tort Liability Act, a governmental employee is not liable for personal injuries sounding in tort provided the employee's "conduct does not amount to gross negligence that is the proximate cause of the injury or damage." M.C.L. § 691.1407(2)(c). Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Id. at § 691.1407(8)(a). A gross negligence claim cannot be maintained as a separate cause of action, but is only relevant in determining whether a governmental actor is entitled to immunity for negligent tort liability. Bletz v. Gribble, 641 F.3d 743, 757 (6th Cir. 2011). Moreover, liability is established only where the "gross negligence that is the proximate cause" of the plaintiff's injury. M.C.L. § 691.1407(2)(c). In his response, Hammond discusses an assault and battery claim, contending that summary judgment is inappropriate for the same reasons as his excessive force claim. Defendants did not discuss an assault and battery claim in their reply but simply contend that summary judgment is warranted on Hammond's state law claims because the individual defendants are entitled to governmental immunity.

Assuming Hammond's state law claim is in fact for assault and battery, governmental actions which constitute intentional torts are only protected by

16

government immunity where they are justifiably warranted. Brewer v. Perrin, 132 Mich. App. 520 (1984). Although an officer may use reasonable force in effectuating an arrest, unjustifiable force may support a claim for assault and battery. Id., see also, Smith v. Yono, 613 F. Supp. 50, 54 (E.D. Mich. 1974). "The measure of necessary force is that which an ordinary prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary." Brewer at 349. Any officer who uses excessive force is liable for assault and battery. White v. City of Vasser, 157 Mich. App. 282, 293 (1984). When considering whether an officer is immunized by the operation of Michigan's Government Tort Liability Act (GTLA), the court is to decide whether there is a genuine issue of material fact regarding whether the force used was objectively reasonable. Murry v. Yuchasz, No. 268909, 2006 Mich. App. LEXIS 3254 (May 11, 2007). This involves essentially the same analysis employed by the court in adjudicating a §1983 claim. See Landis v. Baker, 297 Fed. Appx. 453, 466 (6th Cir. 2008).

The individual defendants are not entitled to immunity for the same reason that they are not entitled to qualified immunity on Hammond's § 1983 claim. Reasonable minds viewing the facts in the light most favorable to Hammond could determine that tackling Hammond to the ground in his own house, choking him, and using a canine to further subdue him while already on the ground, was objectively unreasonable.

V. Conclusion

Defendants have failed to show that no genuine issue of material fact exists with respect to Hammond's claims of excessive force, municipal liability, and assault and battery. Reasonable minds could conclude that the deputies' conduct and use of a
17

canine as well as the nature of Oakland County's policies on the use of a canine violated Hammond's rights. Accordingly, defendants' motion for summary judgment is DENIED.

SO ORDERED.

<u>AVERN COHN</u>
UNITED STATES DISTRICT JUDGE

Dated: 10/29/2019
Detroit, Michigan